# APPERT *v.* SCHMERTZ.

PATENTS; INTERFERENCES.

In an interference proceeding involving priority of invention of a process of and apparatus for making "wire-glass," between Leon Appert, to whom was issued a French patent January 12, 1894, and who filed his application in the United States Patent Office April 27, 1894, and Edmund C. Schmertz, whose applications were filed March 19, 1895, and April 1, 1895 (which applications were rejected on reference to Appert's French patent), and who claimed conception of the invention in June and July, 1893, and reduction to practice, prosecuted with diligence, in January, 1894, *held,* reversing the decision of the Commissioner of Patents awarding priority to Schmertz, that while Schmertz may have come very near to developing the process of the issue in January, 1894, he lacked at least the final step that would have demonstrated the thoroughness of his conception.

Patent Appeals. No. 97. Submitted May 13, 1898. Decided June 7, 1898.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Anthony Pollok* and *Mr. Philip Mauro* for the appellant.

*Mr. William L. Pierce* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

Leon Appert appeals from the decision of the Commissioner of Patents awarding priority of invention to his opponent in an interference proceeding, Edmund C. Schmertz, of a process of and apparatus for making what is called "wire-glass."

1. The issue in controversy is defined as follows:

"1. The process of making glass sheets with wire enclosed therein, consisting in simultaneously forming a layer of

glass and introducing wire thereto, and completing the sheet by forming another layer upon the first layer of glass, the process being carried on progressively.

"2. An apparatus for making sheets of glass with wire enclosed therein, consisting of a table, a leading-roll to roll a layer of glass, means to support and introduce wire to the said layer, a second roll, behind the leading-roll, to form a layer of glass on the first or underneath layer, the periphery of the second roll being higher above the table than that of the leading-roll, and the two rolls being far enough apart to allow the glass for the second or upper layer to be poured between them."

Appert is a citizen of France and a manufacturer of glass in that country. October 19, 1893, he filed his application for a patent in France, and the same was issued to him January 12, 1894.

April 27, 1894, he filed his application in the United States Patent Office. In the course of proceeding thereon an interference was declared between him and one John E. Parker, which resulted in a decision in favor of Appert. 7 App. D. C. 270.

It seems to have been for years an object of desire on the part of glass manufacturers to obtain a process whereby thick plate-glass for skylights and similar uses could be strengthened by a wire support without materially interfering with its light-giving function.

What has been called the "European process," to distinguish it from the others mentioned in this case, was discovered and practiced in Europe in 1886. By this process a plate of glass was first rolled, the wire-gauze was laid upon it, and then a second plate was rolled on the top and welded to the other. The difficulty with this process was that the plates rarely cohered sufficiently and that they became blurred.

September 20, 1892, Frank Shuman, of Philadelphia, was granted a patent for a new process and combination which

has been used in manufacture by him in this country. His apparatus consists of a carriage with three connected rollers mounted upon rails along the sides of the table. The piece of molten glass is laid in front of the first roller and by it rolled to the required thickness. The sheet of wire-gauze is fed down an inclined chute between the first and second rollers. The second roller is ribbed or corrugated and operates to force the wire sheet into the still soft plate to the required distance. The third roller closes up the openings made by the wire and ribbed roller and smooths the plate to a finish.

Appert in his specifications describes the European and the Shuman processes, pointing out what he conceives to be the defects in each, and says:

"To satisfy the various conditions which this manufacture requires, it is necessary, *first*, that the metallic trellis be introduced into the glass paste in a regular manner, and at such distance from the surface of the sheet as may be determined upon beforehand ; *second*, that a trellis with wires as thin as possible and with a very large mesh should be employed, so as not to impair the transparency and solidity of the glass."

He then declares the object of his own invention and says:

"It is characterized by the continuous and progressive formation of two layers of molten glass, and the simultaneous introduction between them of the metallic trellis or network and the compression of the whole into a solid, uniform and homogeneous body or sheet. The simultaneous formation of the two layers with the fabric inclosed between them and the progressive formation of the complete product makes my invention practical, successful and economical, and distinguishes it from the processes referred to above."

His apparatus and process as particularly described are set out substantially in the issues.

The superiority of this third process is claimed to lie in

the simultaneous and progressive steps whereby the wire sheet is laid upon and attached to the first half of the contemplated sheet of glass, as it is rolled, whilst the second half is being rolled immediately behind and upon it. The wire is embedded at the desired uniform depth, the union of the plates complete, and the transparency of the whole unimpaired.

·Edmund C. Schmertz filed an application for patent March 19, 1895, and followed with another on April 1, 1895. Both were rejected on reference to Appert's French patent, and he was notified that to contest priority of invention, he must file an affidavit under Rule 75, showing that his invention was completed prior thereto. He filed affidavits stating that he had completed the invention before October 19, 1893. Through misunderstanding or inadvertence in the Patent Office, Schmertz was not brought into the interference between Parker and Appert, and his applications were held to await the result of that controversy. Schmettz introduced evidence tending to show conception in June and July, 1893, and reduction, prosecuted with diligence, in January, 1894.

The examiner of interferences held that the proof was sufficient to show conception, as alleged, in 1893, but not sufficient to show reduction to practice before January 12, 1894, and decided in favor of Appert.

Appeal was taken to the board of examiners-in-chief, who (two of them only sitting) reversed that decision, holding that the proof showed both conception in June or July, 1893, and diligence in reducing to practice before January 12, 1894.

Appeal having been taken to the Commissioner, he held that the proof was not sufficient to show conception by Schmertz until between January 1 and 10, 1894. He found, however, that having been so conceived by Schmertz, it was followed by diligent efforts to embody it in an operative machine before January 12, and that a successful ma-

chine was made to operate and produce wire-glass by the process of the issue on January 16 or 17, 1894. On this finding of fact the decision in favor of Schmertz was affirmed, and that decision has been appealed from by Appert.

2. Two propositions of law have been urged on behalf of the appellant as requiring a decision in his favor, notwithstanding it may appear that Schmertz conceived the idea of the new process after October 19, 1893, and reduced it to practice, or was diligently engaged in such reduction, on and before January 12, 1894, the date of the issue of Appert's French patent. The first is, that in an interference proceeding under Section 4904, Revised Statutes, the foreign inventor may relate back on the issue of priority to the date of his invention abroad, and is not to be confined to the date of the issuance of his patent in the foreign country. The second is, that by virtue of the operation of Article 4 of the International Convention for the Protection of Industrial Property, between the United States and France and other countries, proclaimed June 11, 1887, (25 Statutes Treaties, 1372: 40 O. G. 446), the appellant is not entitled to a right of priority for the space of seven months from the date of the deposit of his application for his patent in France. The questions for determination under this last contention are, whether that convention is self-executing, and what is the true meaning of the first clause of the article in its reservation of the rights of third parties as applied to the conditions of this case.

These are interesting and important questions; but in the view that we have taken of the facts relating to the claim of invention by Schmertz we do not deem it necessary to consider and determine them.

3. Schmertz resides at Pittsburg, Pa., and is an expert glass manufacturer. He is a stockholder in and secretary of a corporation entitled the "Brownsville Plate Glass Company," which has operated one factory at Brownsville since

1879, and another at New Kensington since 1891. The Brownsville plant was first used in the manufacture of blown window-glass, and its product was changed to rough and ribbed skylight-glass in September, 1889. The New Kensington plant was applied to the same product. Both plants were not in operation at the same time in 1893. That at Brownsville was closed for a season about July 1, and on July 7 the Kensington plant was again operated. This gave Schmertz some leisure, which, he says, he occupied in studying the processes of wire-glass making. He says that he was aware of what is called the "European process," and as early as October, 1892, saw and examined copies of the two patents of Shuman and that of Brogan and Mallock. The Shuman patents were carefully studied. He says that he had a clear conception of the process and apparatus of the issue in June, 1893, and made sketches illustrating both between June 1 and July 7. Some of the many sketches claimed to have been made between June 1, 1893, and January 10, 1894, were produced in evidence and made exhibits in the case. The first appear on the backs of the Patent Office copies of the three patents aforesaid. During this time he says that he showed sketches to his bookkeeper, Hutchison, and to James A. Swearer, manager of the New Kensington works and an officer in the corporation, and consulted with the latter in respect of the best ways of arranging the machinery for operation of the new process. Schmertz produced other sketches—one upon a stock-list taken between December 2 and 9, 1893, another upon a trial-balance sheet from the books of the corporation, as of January 1, 1894, and a third upon an envelope containing some receipts for shipments of pieces used in his apparatus—in the first week of January, 1894. All of these sketches were roughly made with a lead-pencil, some having additions in blue. Whilst the foregoing papers used for sketching, save the envelope, each have dates, there is no date indorsed as that of the sketch itself. For the sketch dates reliance is had solely

upon memory.   About all that is perfectly certain in respect of their dates is that the "trial-balance" sketch could not have been made earlier than some day between January 1 and 10, 1894.   The date January 1, 1894, is indorsed upon this paper in pencil; but Schmertz admits that he wrote it there long afterward as a memorandum of the date to which the trial-balance referred.

All but the sketches on the stock list and trial-balance, unless we except that made by erasures and insertions on Shuman's printed patent drawings, show rollers operating independently of each other; but two—that indorsed on Shuman's patent, No. 483,020, and that on the stock list —show one wheel raised slightly above the other.

W. E. Hutchison, the bookkeeper, who occupied a desk very near that of Schmertz, testified that the latter made about twenty sketches between June 1 and October, 1893, the first of which was on an ordinary piece of paper and is not one of those produced.   He recognized the drawing on the Shuman patent as one of those shown to him.   He says that Schmertz explained his process when the first sketch was made; but, as repeated by the witness, this explanation was perfectly consistent with a plan to operate under the "European process."   It adds no weight to the sketch as an exposition of the special process of the issue.   The very number as well as crudeness of Schmertz's sketches, instead of showing that he had a clear conception of a new process, tend rather to show uncertainty of mind or a confusion of ideas.

The "European process," it will be remembered, consisted in making, first, a sheet of glass about one-half the required thickness of the completed one, placing the wire thereon, and then rolling another directly upon the top of the first, with the purpose of welding the two together.   The objection to its practical working was chiefly in the difficulty of producing perfect cohesion between the two separately made plates.   The process of the issue seeks to overcome that diffi-

culty by introducing the wire-gauze in the act of rolling the first half of the plate of glass, and immediately rolling the second half on top of the first as it is being formed and while still in a state of fusion, admitting of its complete incorporation with the second, the two thereby becoming one perfect plate with the wire in the center of the mass. The table and roller of the ordinary process remain in use as formerly, but a second roller is necessarily added. Because, however, of the double thickness of the second roll, the last roller can not move on the same plane as the first. It has to be elevated to correspond with the increased thickness. This can be accomplished by recessing the ends of the first roller or the body of the second, or by mounting the second on different strands or "trangs" raised the required height above the first. Feeding the wire on the first roll as it progressed was one of the features of Shuman's process. Schmertz was known to Shuman as engaged in the manufacture of glass for skylights, and was visited by the latter in 1892 or at some time in 1893 prior to June 1. His object was to interest Schmertz in his ideas respecting the manufacture of wire-glass. He also disclosed ideas touching the rapid rolling of a second ball of glass upon the first plate and attached wire before it had time to cool too much for complete welding, but did not suggest the "simultaneous and progressive" rolling. Schmertz said that he would make trials and inform Shuman of the results. He afterward wrote to Shuman saying that he had given the matter considerable thought, had tried the processes suggested, and found they would have to be considerably modified before they would work. Nothing more was heard from Schmertz until after Shuman had arranged with the American Wire Glass Company and commenced the manufacture of wire-glass at Tacony, near Philadelphia.

James A. Swearer says that Schmertz discussed the subject with him at times in 1893, and explained his ideas; but he would not say expressly that Schmertz explained the

distinctive process of making the wire-glass by simultaneous and progressive rolling of the plates, as now defined in the issue. And when testifying to the actual manufacture of glass on January 16 and 17, 1894, by Schmertz's apparatus and process, the most that he would say was that, as he now remembered (December 16, 1896), the principles were the same.

In a general sense, the principle of all the processes is the same. Their foundation is the European process. The result sought is the same in all. The difficulty lies and invention is involved in the discovery of a new and practical means by which that result may be attained in such manner as to prove commercially valuable.

In accounting for the crudeness and incompleteness of Schmertz's sketches, it has been urged that they were made for the benefit of his associates, who, like Swearer, were skilled glass-makers, and could readily understand them when explained, without necessity of fullness or exactness in detail. This suggestion, when applied in the consideration of Swearer's evidence, gives weight to his inability to state that the subsequent attempt at reduction to practice, in January, 1894, was a carrying out, both in apparatus and process, of one distinct conception illustrated by all of the sketches. Considering all the direct evidence on behalf of Schmertz relating to his sketches and disclosures to his associates in 1893, we do not think it is sufficient to establish, with reasonable certainty, anything more than the fact that, stimulated by the suggestions of Shuman, he had tried to find a way in which the European process could be practically worked out for commercial purposes, but without reaching a satisfactory conclusion. With means and appliances and skilled assistants at hand, and the necessary leisure, he made no effort whatever until January, 1894, to put in execution a process conceived in the preceding June. The conclusion that he had no accurate conception of the process, as now claimed, is confirmed by evidence of conduct about which there can be no question.

Shuman, as Schmertz knew, was manufacturing glass by his process at Tacony in 1893. On November 10, 1893, he wrote Shuman a letter in which, after referring to a letter of introduction from one Webber, he says:

"As I explained to Mr. Webber while in New York, I have understood that you have made quite a success of the wire-glass business, and also that it was your intention to dispose of the right of making wire-glass for the western trade. As we are situated favorably for this very business I think we would be the proper people to talk to you on the subject. I will write you a day or so before starting east."

On December 1, replying to a letter of Shuman of November 29, he wrote that business matters had prevented his visit, but that he would go soon. On December 29 or 30 he visited Tacony and was shown through the works by Shuman. He saw and examined the operation of Shuman's apparatus and process. Returning to Pittsburg he wrote, January 4, 1894, to W. L. Elkins, president of the American Wire Glass Company, at Tacony, as follows:

"DEAR SIR: Since my return from the east we have been considering the 'wire-glass' matter, and as yet have not decided on anything definite. Our attorney advises us to look into the matter of all the patents taken out in relation to 'wire-glass' having in view to ascertain how thoroughly you have protected your patent. We would not care to go into the manufacture of this glass, with the danger of some other party afterward being able to make it by another process. Would you kindly send us a list of all the numbers of patents you have at present? Our president, Mr. James A. Swearer, would like to see your process, and if agreeable to you will come to Phila. some time within the next week to go through your factory. An early reply will oblige."

Receiving a favorable reply, James A. Swearer visited Tacony, and spent January 11 and 12 in inspecting the Shuman process, for which every facility was afforded.

Assuming that these letters were written and these visits

made in good faith, it is impossible to reconcile the conduct of Schmertz and Swearer with the fact that Schmertz then had a clear conception of a process different from that of Shuman, and which had been explained to and understood by Swearer.

4. The evidence of conception and reduction to practice in January, 1894, consists, first, of sketches, one of which— that on the " trial-balance "—could not have been made before. The " stock list " sketch could not have been made earlier than December 2, 1893. It shows one roll raised above the plane of the other. Under this is written with pencil: " First sheet half-thickness of finished glass. 1st roll recessed at each end." " 1st," as shown, has been written over an erasure of the word " last."

The day after the last letter to Shuman, January 4, Schmertz ordered a large roller sent from the Brownsville works to Pittsburg, which upon arrival was sent to a foundry and recessed at each end. It was reshipped and received at the New Kensington works on January 10, and prepared for use on January 15, Swearer having in the meantime returned from his visit to Tacony. The purpose of recessing the end of the roll is to bring its intermediate part nearer the table in the process of rolling the glass.

As the strength of Schmertz's claim to the discovery of a new and complete process is made to depend largely upon the novelty of this recessed roller, and its importance in the successful use claimed to have been made January 16 and 17, 1894, both are to be considered in the light of other facts and circumstances. In the first place, then, as before remarked, the European process required the second plate to be formed by a roller operating upon a higher plane than the one used in making the first, and this was easily accomplished by recessing the ends of the first roller to the necessary depth. In the next place, Shuman testifies that rollers recessed at ends were used in the works at Tacony at the time of inspection by both Schmertz and Swearer, for

the purpose, when necessary, of bringing the rolling surface nearer the table when mounted on the same strand or trang. This elevation at the time of the second roll is also a necessary feature of the European process.

Shuman is a disinterested witness. He could not be mistaken, and it is not probable that he would have made a false statement in regard to a thing that must have been within the knowledge of those in the factory who daily operated his apparatus. Schmertz and Swearer both say that they did not see a recessed roller; but if there it seems impossible that it could have escaped their notice. They were skilled in the art, were there to make a close inspection, and the recessed roller was, as they say, a leading feature of their own contemplated construction. They were either in good faith, as shown by their correspondence with Shuman, inspecting his process to ascertain the advisability of purchasing a right to its use, or else they had, under false pretenses, obtained access to his works for the purpose of borrowing ideas in perfecting their own invention. Moreover, they did not go together; but Swearer, after consulting with Schmertz and after the order for the roller to be shipped from Brownsville, made his own independent visit and careful inspection. If their purpose was not that disclosed in the correspondence, it was carefully concealed from Shuman and the officers of his company. Immediately after Swearer's return the attempt was made to manufacture glass in accordance with Schmertz's plans.

Schmertz, Swearer, and Toynbee, a ladler in their service, testify to the preparation of the apparatus and the successful operation of the process on January 16 and 17. Necessarily another ladler was required in carrying out the process, as well as several other assistants. None of these were produced as witnesses. The three aforesaid testify that some well-made and merchantable wire-glass plates were rolled on those trials. Strange to say none has been preserved, and the earliest manufacture that has been exhibited in evidence

was not made before May, 1895, notwithstanding it is said that the experiments were renewed at other dates in 1894.

Obviously, as stated by Shuman in giving his opinion of what was shown by Schmertz's sketches, successful improvement upon the European process depended upon rolling the second or half plate upon the first at the earliest practicable moment, else cohesion would not take place properly. The second rolling could follow more rapidly than in the European process by reason of the Shuman idea of feeding the wire upon the first plate in the process of rolling it. Something necessarily depended upon the varying temperatures of the separate balls of glass. If the rollers were separately operated, the second must move with proper speed and at the opportune moment. If connected, space sufficient must be left for ladling in the second ball of glass, and this must be promptly done. Successful achievement depended upon many contingencies.

In rebuttal, Appert called a witness, Charles C. Stauffer, who was employed at the New Kensington factory during 1894 until August. He witnessed the experiments, being engaged in introducing the plates into the annealing furnace, which is the final act in the process of manufacture. Whilst so engaged he witnessed the experiments of 1894. These were regarded by him and other workmen as failures. The products were thrown in large quantities upon the refuse dump. He was not impeached, and though an attempt has been made to discredit him by calling him "a witness with a grievance against Schmertz," we find nothing in the record to justify the censure. On the other hand, observing nothing from which to infer his prejudice or bias in the case, we regard his evidence as entitled to great weight. He was not only an experienced worker in plate-glass manufacture, employed at the very place and time of making the experiments, but also one possessed of some skill in mechanic art. His observation was quickened and his memory impressed by the fact that during the same

period he was co-operating with one James N. Gregg in the invention of an apparatus and a process for making this same wire-glass. It is reasonable to suppose that the complete success of Schmertz's simpler apparatus, which, if true, was bound to be known to Stauffer, would have abated his and his associate's zeal in the prosecution of their own invention; but instead, it appears that they continued their labors and perfected their invention July 7, 1894, one month before Stauffer left New Kensington works. They filed their application, upon which a patent was issued, February 19, 1895. These facts were known to Schmertz. Looking at their drawings and specifications, it is apparent that they did not borrow from the apparatus of Schmertz. Their process is more akin to Shuman's. Their plan is to feed the wire through a device whereby it is tightly held at the desired uniform distance above the bed or table—say one-half the proposed thickness of the glass plate when finished. The molten glass is then fed upon this stretched wire, passing in part through its meshes, and is followed by the roller that presses it into one solid plate, in the middle of which, theoretically, the wire will become embedded. In common with the others, its practical utility can only be determined by use. Schmertz, knowing their efforts, proposed to them to set up their machine and experiment with it for thirty days in his factory, making necessary changes and improvements at their expense. At the end of the thirty days he was to have an option of sixty days either to use the machine and process under a royalty of one and one-half cents per foot, or to purchase the sole right to use in the United States for the sum of $30,000. The negotiation failed. Schmertz corroborates him in respect of the failure of this negotiation between them, and there is nothing in the testimony of either to indicate that it resulted in unfriendliness or ill will.

Now, if the experiments of January 16 and 17 demonstrated the successful completion of invention, what is there

to account for the long delay in attempting to put the product upon the market? Why such long delay—nearly fifteen months—in applying for a patent even? Other inventors were at work in the same field. Shuman's testimony shows that there was considerable demand for his product, and Schmertz's conduct proves that he attached great value to the discovery of an effective process for making the new glass. The principal, if not the only, product of his factory during the time was skylight-glass.

The only excuse for this delay is in the great depression in trade in 1893 and 1894. Grant that notice will be taken of this general depression, still there is no evidence to indicate that it affected Schmertz's company other than that one of its factories had ceased operations. The New Kensington plant was turning out the ordinary rough and ribbed glass. The new product, being greatly superior, would surely have been in demand.

There was nothing whatever to prevent his applying for a patent, as Gregg and Stauffer did, and thus protecting his valuable discovery. His efforts in the matter of discovery attest his sense of the value of a better process for making the new glass. He expressed a desire to engage in manufacturing under Shuman's process, unless we assume that his representations to Shuman were falsely made in order to obtain an inspection of his apparatus and its operation. To assume their falsity would be to discredit his entire testimony.

In accounting for his proposition to obtain control of the Gregg and Stauffer patent, he effectually disposes of the theory that his inaction in the matter of utilizing his process, and especially in delaying to apply for a patent, was due to the dullness of the markets and the stress of the hard times. He said in that regard: "I wished to keep the Gregg and Stauffer patent from getting into the hands of other manufacturers of glass who would prove competitors."

We are constrained to believe that, while Schmertz may

have come very near to developing the process of the issue in January, 1894, he lacked at least the final step that would have demonstrated the thoroughness of his conception and crowned his labors with success.

For the reasons given, priority is awarded to Appert. The decision appealed from will be reversed, and the proceeeings herein certified to the Commissioner of Patents. It is so ordered.                              *Reversed.*